**ARTHROCARE CORPORATION,**
**Plaintiff,**

v.

**SMITH & NEPHEW, INC., Defendant.**

**No. CIV.01–504–SLR.**

United States District Court,
D. Delaware.

April 27, 2004.

Jack B. Blumenfeld, Karen Jacobs Louden, James W. Parrett, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Weil, Gotshal & Manges LLP, Redwood Shores, CA (Matthew D. Powers, Jared Bobrow, Perry Clark, of counsel), for plaintiff.

William J. Marsden, Jr., Keith A. Walter, Jr., Fish & Richardson P.C., Wilmington, DE, Fish & Richardson P.C., Boston, MA (Mark J. Hebert, Kurtis D. MacFerrin, of counsel), for defendant.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I.  INTRODUCTION

On July 25, 2001, plaintiff Arthrocare Corporation ("Arthrocare") filed this ac-

tion against defendant Smith & Nephew, Inc. ("Smith & Nephew") alleging willful direct, contributory, and inducing infringement of certain claims of U.S. Patent Nos. 5,697,536 (the "'536 patent"), 5,697,882 (the "'882 patent") and 6,224,592 (the "'592 patent"). (D.I.1) Smith & Nephew answered the complaint on September 13, 2001 denying the infringement allegations and asserting five affirmative defenses including noninfringement, invalidity, misuse, unenforceability based upon inequitable conduct, and unclean hands. (*Id.*) Smith & Nephew also asserted counterclaims for a declaratory judgment that the patents in suit are invalid and not infringed by any act of Smith & Nephew and that the '592 patent is unenforceable due to inequitable conduct. (D.I.10) On September 26, 2001, Arthrocare denied Smith & Nephew's counterclaims. (D.I.20) With the court's permission, Smith & Nephew amended its answer on November 27, 2002 to add counterclaims for antitrust violations under 15 U.S.C. § 1 of the Sherman Act. (D.I.219) By order dated November 27, 2002, the court stayed discovery and trial related to the antitrust counterclaims. (D.I.206)

From April 30, 2003 through May 9, 2003, the parties tried the issues of infringement and invalidity before a jury. The jury found by a preponderance of the evidence that Smith & Nephew directly infringed, induced infringement, and contributed to the infringement of claims 46, 47, and 56 of the '536 patent with its Saphyre, ElectroBlade, and Control RF products. (D.I.405) The jury also found by a preponderance of the evidence that Smith & Nephew induced infringement and contributed to the infringement of claims 13, 17, and 54 of the '882 patent

with its Saphyre, Saphyre with Suction, and Control RF products. (*Id.*) In addition, the jury found by a preponderance of the evidence that Smith & Nephew induced infringement and contributed to the infringement of claims 1, 3, 4, 11, 21, 23, 26, 27, 32, and 42 of the '592 patent with its Saphyre, ElectroBlade, and Control RF products.[1] (*Id.*) The jury further found that Smith & Nephew did not prove by clear and convincing evidence that the patents in suit are invalid. (*Id.*)

Following this verdict, the parties filed numerous post-trial motions. Smith & Nephew, in particular, challenged every issue that the jury decided and also nearly every issue that the court decided. The court issued a memorandum opinion and order on March 10, 2004 addressing these motions. (*See* D.I. 483, 484) The court found that the jury based their decisions as to infringement and invalidity upon substantial evidence and upheld the jury verdict. The court granted Arthrocare's motion for a permanent injunction pursuant to the findings of infringement.

Presently before the court are Smith & Nephew's motion for reconsideration of orders granting Arthrocare's motion for a permanent injunction and Smith & Nephew's motion to stay the injunction or, alternatively, to grant a transition period. For the reasons that follow, the court denies the motion for reconsideration, denies the motion to stay in part as to the stay per se, and grants the motion to stay in part to allow for a three month transition period.

## II. DISCUSSION

### A. Smith & Nephew's Motion for Reconsideration of Orders Granting Arthrocare's Motion for a Perma-

---

1. The jury was not asked to decide whether Smith & Nephew contributed to the infringement or induced the infringement of claims

21 and 42 of the '592 patent with its Saphyre or ElectroBlade products.

### nent Injunction[2]

■ "As a general rule, motions for reconsideration should be granted 'sparingly.'" *Stafford v. Noramco of Delaware, Inc.,* 2001 WL 65738, *1 (D.Del.2001)(quoting *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991)). The purpose of granting a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985)(citing *Keene Corp. v. International Fid. Ins. Co.,* 561 F.Supp. 656, 665 (N.D.Ill.1982)). Parties, therefore, should remain mindful that a motion for reconsideration is not merely an opportunity to "accomplish repetition of arguments that were or should have been presented to the court previously." *Karr v. Castle,* 768 F.Supp. 1087, 1093 (D.Del.1991)(citing *Brambles U.S.A., Inc. v. Blocker,* 735 F.Supp. 1239, 1240–41 (D.Del.1990)). A court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result. *Id.* (citing *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989)).

Smith & Nephew complains that the court, in granting Arthrocare's motion to dismiss its antitrust counterclaim, relied on two mistaken assumptions: (1) that Arthrocare's motion to dismiss was unopposed; and (2) that the viability of Smith & Nephew's antitrust counterclaim depends on a showing that the antitrust action was objectively baseless "sham" litigation. Smith & Nephew argues that it did not respond to the motion to dismiss because the court specifically stayed the antitrust counterclaim pending resolution of the patent issues during a teleconference with the parties on June 9, 2003. As a result, Smith & Nephew asserts that its intent to oppose the motion to dismiss coupled with the court's orders staying the issue presents sufficient grounds for reconsideration.

■ The court disagrees. As noted above, on November 27, 2002, the court issued a memorandum order staying **discovery** and **trial** of Smith & Nephew's antitrust counterclaim. (D.I.206) The court reviewed this order in deciding the motion to dismiss and concluded that said stay did not impact the motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Arthrocare filed this motion in lieu of an answer to Smith & Nephew's antitrust counterclaims. As such, the court simply addressed the sufficiency of Smith & Nephew's counterclaim; it did not resolve disputed facts or decide the merits of Smith & Nephew's antitrust case. Therefore, the court acted consistent with its prior rulings.[3]

■ More importantly, the court decided said motion based upon the correct law. The court noted in its memorandum opinion that "[t]he Supreme Court has held

---

**2.** Because the court dismissed Smith & Nephew's antitrust counterclaim, the court concluded that it was not premature to enter a permanent injunction in favor of Arthrocare. (D.I. 483 at 90, n. 29) Thus, Smith & Nephew's instant motion is inextricably tied to the motion to dismiss. The court, therefore, necessarily must address its decision to dismiss the antitrust counterclaims in the context of the instant motion for reconsideration.

**3.** Smith & Nephew's reliance on one statement from a June 2003 teleconference is mis-

placed. The court notes in this regard that the instant docket consists of hundreds of entries, including a dozen transcripts from telephone conferences. The court has had to resolve fifty-one substantive motions in this case, which is only one of sixty-six patent cases on the court's docket. If Smith & Nephew believed that Arthrocare's motion was premature and inconsistent with the court's prior rulings, it should have indicated so in a timely manner.

that *Noerr–Pennington* immunity does not apply to petitions that are a 'mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" (D.I. 481 at 6–7) The court applied this holding and concluded that "the objective threshold for 'sham' litigation is not satisfied and that the *Noerr–Pennington* doctrine shields Arthrocare from liability for Smith & Nephew's antitrust counterclaims." (*Id.* at 8) The court is not persuaded that any argument from Smith & Nephew about the basis for its antitrust allegations will change the court's decision. Accordingly, because the court is convinced that it properly decided the motion to dismiss, the court denies Smith & Nephew's motion for reconsideration of orders granting Arthrocare's motion for a permanent injunction.

### B. Smith & Nephew's Motion to Stay the Permanent Injunction Or, Alternatively, to Grant a Transition Period

■ Smith & Nephew seeks a stay of the permanent injunction pending appeal to avoid injustice or, in the alternative, a six to twelve month transition period to allow the medical community to switch to alternative products. A court may stay an injunction pending appeal pursuant to Federal Rule of Civil Procedure 62(c). In exercising its discretion to issue such a stay, the Federal Circuit has indicated that a court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Standard Havens Prods. v. Gencor Indus.*, 897 F.2d 511, 512 (Fed.Cir.1990) (citations omitted). The Federal Circuit also has opined that each factor need not be given equal weight. *Id.* at 513. Instead, a court should use a flexible balancing approach.

■ Applying these considerations to Smith & Nephew's assertion that it is entitled to a stay pending appeal, the court finds that Smith & Nephew has not established any of *Standard Havens* factors sufficient to warrant a stay. First, there is no convincing evidence that Smith & Nephew's appeal carries a strong likelihood of success on the merits. Smith & Nephew argues that the ultimate validity of the asserted patents is in substantial doubt given that the United States Patent & Trademark Office ("PTO") has granted its requests for reexamination of each of the asserted patents, finding "substantial new questions of patentability." A reexamination proceeding, however, is different from litigation. Indeed, the Federal Circuit has recognized that "litigation and reexamination are distinct proceedings, with distinct parties, purposes, procedures, and outcomes."[4] *Ethicon, Inc. v. Quigg*, 849

---

4. The Federal Circuit explained the distinctions between the two proceedings succinctly as follows:

> Before the courts, a patent is presumed valid and the party asserting invalidity must prove the facts to establish invalidity of each claim by clear and convincing evidence.... In a reexamination proceeding, on the other hand, there is no presumption of validity and the "focus" of the reexamination returns essentially to that present in an initial examination, ... at which a preponderance of the evidence must show nonpatentability before the PTO may reject the claims of a patent application.... The intent underlying reexamination is to 'start over' in the PTO with respect to the limited examination areas involved, and to re-examine the claims, and to examine new or amended claims, as they would have been considered if they had been originally ex-

F.2d 1422, 1427 (Fed.Cir.1988)(citing *In re Etter*, 756 F.2d 852, 857 (Fed.Cir.1985)). To this end, "[t]he two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions.... And, if the district court determines a patent is not invalid, the PTO should continue its reexamination because, of course, the two forums have different standards of proof for determining validity." *Id.* at 1428–29. In light of these differences, the court is not persuaded that the ongoing reexamination proceeding triggers a stay of the injunction. A jury has decided the validity of the patents in suit after careful deliberation following a nine day jury trial. This court reviewed the jury's verdict pursuant to post-trial motions and found that the jury based its decision on substantial evidence. Thus, the court has no reason to believe that Smith & Nephew will be successful on its appeal such that the court presently should issue a stay.

Smith & Nephew also asserts that there are substantial claim construction issues on appeal that will require further action by the court.[5] Smith & Nephew reminds the court that "the Federal Circuit conducts a de novo review of claim construction, and quite frequently reverses or at least modifies the construction applied by the [d]istrict [c]ourt." (D.I. 487 at 11) Nevertheless, as counsel for Smith & Nephew is aware, the court previously has held that the "possibility of appellate de novo review of its claim construction does not constitute an extraordinary circumstance to merit a stay." *Eaton Corp. v. Parker–Hannifin Corp.*, 292 F.Supp.2d 555, 582 (D.Del.2003); *see Tristrata Tech.,*

*Inc. v. ICN Pharms., Inc.*, 2004 WL 856595, *2 (D.Del.2004).

Smith & Nephew further contends that it will appeal the fact that the jury was allowed to decide the validity of the Certificate of Correction for the '882 patent. Smith & Nephew maintains that such procedure was contrary to the steps outlined in *Superior Fireplace v. Majestic Prods.*, 270 F.3d 1358 (Fed.Cir.2001). Smith & Nephew, therefore, avers that it has a reasonable likelihood of succeeding on this claim.[6] This assertion is little more than conclusory attorney argument. Moreover, the court agreed with the jury verdict that the certificate of correction is valid. Therefore, even if it was improper to submit this decision to the jury, the court ultimately decided the very issue at the heart of Smith & Nephew's complaint. Accordingly, the court concludes that the first factor weighs against the issuance of a stay.

Second, Smith & Nephew argues that it will be irreparably harmed if a stay is not granted because it will be unable to recover a position in the market. In this regard, Smith & Nephew claims that its ElectroBlade and Saphyre probes are the result of twenty-seven years and millions of dollars in research and development efforts. This argument is a warmed-over version of Smith & Nephew's prior contentions made in opposition to Arthrocare's motion for a permanent injunction. As the patentee, Arthrocare presumptively has suffered irreparable harm throughout the duration of Smith & Nephew's infringing activities. Smith & Nephew cannot now

---

amined in light of all of the prior art of record in the reexamination proceeding. *Id.* (citations and quotations omitted).

**5.** Smith & Nephew particularly challenges the court's claim construction of the "not in

contact" limitation in the '592 patent and the "connector" limitation of the '536 patent.

**6.** Absent a finding of validity of the Certificate of Correction, Smith & Nephew would not be liable for infringement of the '882 patent.

attempt to turn the table and argue that it will suffer harm for continuing to engage in infringement. Such contention offends the very rights associated with obtaining a patent. Additionally, the only harm that Smith & Nephew will suffer with any certainty is the loss of profits from the sale of its ElectroBlade and Saphyre probes.[7] Smith & Nephew has failed to show that any of its employees will lose their jobs, despite alleging that its employees derive their livelihood from the manufacture and sale of the infringing products. As the court originally stated in deciding the parties' post-trial motions, "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 (Fed.Cir.1986); see also *E.I. du Pont de Nemours & Co., v. Phillips Petroleum Co.*, 659 F.Supp. 92, 94–95 (D.Del. 1987) (stating "the loss of customers or business built upon the sale and use of infringing products does not amount, in the context of a patent infringement suit, to irreparable harm from which [the defendant] should be shielded"). The court, consequently, concludes that the second factor weighs against the issuance of a stay.

Third, Smith & Nephew claims that Arthrocare's pattern of licensing demonstrates that monetary damages will adequately compensate Arthrocare for its continued infringement during the appeals process. This argument is unpersuasive. Staying the injunction during the appeals process would essentially allow Smith & Nephew to continue to infringe, thereby further usurping the exclusivity that Arthrocare is entitled to enjoy as a result of its patents. Such exclusivity underlies the patent system in the United States. Moreover, Arthrocare's patent rights are not compromised simply because it opted to license its patents to select competitors. "Once the patentee's patents have been held to be valid and infringed, he should be entitled to the full enjoyment and protection of his patent rights." *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983).

Furthermore, if Smith & Nephew continues to sell its infringing products, Arthrocare likely will lose market share, profits, and goodwill. Smith & Nephew, in fact, has implemented a specific program within its sales force to convert Arthrocare's customers to using Smith & Nephew products. (*See* D.I. 491, ex. A) The Federal Circuit has observed that "because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456–57 (Fed. Cir.1988). As well, "[i]f monetary relief were the sole relief afforded by the patent statute then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts." *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed.Cir.1985). In light of the foregoing, the court concludes that the third factor weighs against the issuance of a stay.

Finally, Smith & Nephew charges that an injunction would adversely affect surgeons and their patients. Smith & Nephew specifically claims that denying a stay will deprive surgeons in the United States

---

7. Smith & Nephew reported revenue of almost two billion in 2003. (D.I. 487 at 16 n. 5) From the infringing products alone, Smith & Nephew generated six million in sales before trial and approximately 7.5 million since the jury verdict. (*See* D.I. 418 at 869; D.I. 491 at 18)

of their choice of surgical instruments, especially given that the infringing products offer unique features and medical advantages not available in other products.[8] Nonetheless, the court does not find a stay warranted simply because the litigation at bar involves medical devices as opposed to some other technology that does not relate to issues of human health.[9] While the court appreciates that select surgeons like Dr. Roy A. Majors and Dr. Gary S. Fanton, both of whom submitted declarations on behalf of Smith & Nephew, rely on the unique features offered by the ElectroBlade and Saphyre products, the court finds that reasonable alternative probes exist in the market. As mentioned previously in the court's post-trial memorandum opinion, ArthroCare, Mitek, and Stryker offer probes for use in arthroscopic surgery. The court has no reason to believe that these probes will pose medical risks to patients. Surgeons in the United States, therefore, may utilize them in place of the ElectroBlade and Saphyre probes, albeit after instruction and training. Consequently, the court finds that the fourth factor weighs against the issuance of a stay.

In sum, since all four of the *Stanford Havens* factors weigh against the issuance of a stay, the court concludes that a stay pending appeal is not justified. Accordingly, the court denies Smith & Nephew's motion to stay the injunction.

With regard to a transition period, the court disagrees with Smith & Nephew that the medical community may need six to twelve months to effect an efficient and orderly transition. The jury returned its verdict of infringement on May 12, 2003. Smith & Nephew, nevertheless, continued to sell and presently still sells the ElectroBlade and Saphyre probes.[10] Smith & Nephew could have utilized the time between the jury verdict and present to implement the transition it now requests. What is more, a lengthy transition of six to twelve months will cause further irreparable harm to Arthrocare. Notwithstanding this, the court finds that a short transition period of three months is appropriate to allow Smith & Nephew time to alert surgeons not to utilize its probes. This period will also permit the surgeons who rely on Smith & Nephew products to receive instruction and switch to alternative probes. During this time, Smith & Nephew shall not sell any additional infringing probes from its inventory. If Arthrocare becomes aware of such sales by Smith & Nephew, then Arthrocare may immediately notify the court.

## III. CONCLUSION

The court denies Smith & Nephew's motion for reconsideration of orders granting Arthrocare's motion for a permanent in-

---

**8.** The ElectroBlade combines a mechanical shaver with an RF coagulation device, thereby allowing surgeons to resect soft tissue, coagulate bleeders, and continue resecting with a single instrument. The Saphyre utilizes a CoolBack feature, which prevents contact between the return electrode and non-target tissue.

**9.** The court notes that Smith & Nephew attempts to mislead it into believing such to be the case in the District of Delaware by its characterization of *C.R. Bard, Inc. v. Medtronic, Inc.*, 1999 WL 458305 (D.Del.1999).

Smith & Nephew suggests that the court stayed an injunction pending appeal because the technology involved arterial filters. (*See* D.I. 487 at 17) In truth, the court stayed the injunction because the jury's verdict rested on a close question of law concerning the doctrine of equivalents. *Id.* at 15.

**10.** Smith & Nephew stated that in the past year surgeons treated 50,000 patients at 900 hospitals and surgery centers and 200 sales representative spent approximately $1,100,000 training surgeons and hospital staff to use its probes. (*See* D.I. 487 at 17)

junction. The court also denies Smith & Nephew's motion to stay in part as to the stay per se and grants said motion in part to allow for a three month transition period. An order shall issue.